UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HIGUCHI INTERNATIONAL
CORPORATION d/b/a HIGUCHI
MANUFACTURING AMERICA
and HIGUCHI MANUFACTURING
MEXICO S. de R.L. de C.V.,

                Case No. 23-cv-11869

          Plaintiffs,

                Paul D. Borman

v.                United States District Judge

AUTOLIV ASP, INC.,

          Defendant.
_____/

## OPINION AND ORDER
## DENYING PLAINTIFFS' EXPEDITED MOTION FOR DECLARATORY JUDGMENT (ECF No. 11); DISMISSING WITH PREJUDICE PLAINTIFFS' AMENDED COMPLAINT (ECF No. 3); AND GRANTING DEFENDANT'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 14)

## I. BACKGROUND

**A. Autoliv orders steel parts from Higuchi through purchase orders and releases.**

Defendant and Counterclaim-Plaintiff Autoliv ASP, Inc. is a tier-1 automotive manufacturer that has in recent history bought "more than 170 [unique stamped steel] parts" that it uses to build "various seatbelt systems" from Plaintiffs and Counterclaim-Defendants, and tier-2 manufacturers, Higuchi International Corp.

d/b/a Higuchi Manufacturing America and Higuchi Manufacturing Mexico S. de

R.L. de C.V. (collectively, "Higuchi"). (ECF No. 11, PageID 187; ECF No. 14,

PageID 306.)

At issue here are a series of purchase orders and subsequent releases executed by

the parties. The purchase orders provide, in relevant part:

> I.    STATEMENT OF WORK
> 1.0 This blanket contract is issued to cover Autoliv ASP, Inc.'s
> requirements of the parts listed below, for the period beginning
> 05/01/22 [or a different date, depending on the purchase order] and
> ending upon the termination of the vehicle platform, including service
> part requirements, for which the parts listed herein are used. Deliveries
> shall be made only in the quantities and at the time specified in such
> requirements. Autoliv ASP, Inc. shall reserve the right to change, from
> time-to-time, the quantities specified in any part requirement. In such
> event Autoliv ASP, Inc. shall be under no obligation to [Higuchi][1]
> unless the delivery or fabrication of such parts or the acquisition of such
> raw materials was specifically authorized in a Release delivered to
> [Higuchi] from Autoliv ASP, Inc[.]

(ECF No. 3, PageID 48; *see also* ECF Nos. 11-3 and 14-3.) As alluded to in that

paragraph, the purchase orders also contain a list of parts that includes, among other

things, part numbers, descriptions, and unit costs.

Further, the purchase orders include the following "Note I" (among other Notes):

---

[1] A standalone line right before this paragraph states, "This Contract entered into by
and between Autoliv ASP, Inc. and / HIGUCHI MANUFACTURING AMERICA,
LLC / Hereinafter referred to as 'The Supplier' Witnesseth That:" (ECF No. 3,
PageID 48.) Higuchi has not suggested that this Court should treat Higuchi
Manufacturing Mexico differently from Higuchi Manufacturing America in this
case, so the Court has replaced "The Supplier" with "Higuchi" above.

> This Purchase Order/Contract does not constitute Autoliv's promise to order or buy any volume of or level of service, unless separately confirmed in writing by Autoliv or electronically in accordance with established means. Nor does this purchase order/contract represent Autoliv's promise to purchase items or services beyond mutually agreed time periods[.]

(ECF No. 3, PageID 51.)

Additionally, the purchase orders "incorporate[] by reference" some other documents, including a Purchase Order Terms and Conditions document (labelled "ASP-544, Rev. 11/08"). (ECF No. 3, PageID 52.) These Terms and Conditions set the following rights and obligations (among others):

> **Article 25. BREACH BY SELLER; AUTOLIV ASP'S RIGHT TO TERMINATE FOR CONVENIENCE**
> . . .
>
> (b) In addition to any other rights of Autoliv ASP to cancel or terminate this Contract, Autoliv ASP may at its option immediately terminate all or any part of this Contract or releases hereunder, at any time and for any reason, by giving written notice to Seller. . . .
>
> (c) Notwithstanding the foregoing, Autoliv ASP shall not be obligated to make payments for finished goods, work-in-progress or raw materials fabricated or purchased by Seller in excess of amounts authorized by this Contract and delivery releases issued by Autoliv ASP hereunder . . .

(ECF No. 11-3, PageID 234–35.)

A Release produced by Autoliv shows a list of parts with "[s]hip [d]ates" and "[r]elease [quantities]." (ECF No. 11-4.)

**B. The Michigan Supreme Court releases the *Airboss* decision.**

On July 11, 2023, the Michigan Supreme Court entered its decision in *MSSC, Inc. v. Airboss Flexible Products Co*. In this decision, the Court crystallized what the "quantity term" of the Uniform Commercial Code ("UCC")'s statute of frauds provision demands, clarified the distinction between requirements contracts and release-by-release contracts, and provided important guidance for purchase-order-followed-by-release arrangements like the one at issue here.

The Michigan Supreme Court began *Airboss* by noting that, "[u]nder Michigan law, contracts for the sale of goods—including supplier contracts—are governed by the [UCC], MCL 440.1101 *et seq*." *MSSC, Inc. v. Airboss Flexible Products Co.*, -- N.W.2d --, No. 163523, 2023 WL 4476721, at *3 (Mich. July 11, 2023). It then relayed that "[t]he UCC contains a statute-of-frauds provision that" states that "'a contract for the sale of goods for the price of $1,000 or more is not enforceable . . . unless there is a writing sufficient to indicate that a contract for sale has been made'" and that "'the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.'" *Id.* (quoting MCL § 440.2201(1)) (internal italicization omitted). The Supreme Court emphasized that, "[w]hen a contract fails to include a quantity term, parol evidence—that is, evidence outside the contract

itself—'[cannot] be offered to supply a missing quantity term.'" *Id.* (quoting *In re Frost Estate*, 130 Mich. App. 556, 559 (1983)).[2]

The Court also noted, however, that the UCC "allows for a contract's quantity to be measured 'by the output of the seller or the requirements of the buyer,'" and thereby "allows for parties to enter into contracts that provide a quantity term but lack specificity as to the total of goods agreed upon." *Id.* (quoting MCL § 440.2306(1)). In keeping with that allowance, the Court stated that "output contract[s]," which "define[] quantity by the supply provided by the seller," and "requirements contract[s]," which "define[] quantity by reference to the buyer's requirements," contain enforceable quantity terms. *Id.* at *3. It explained:

> In agreements between a buyer and supplier-seller, requirements contracts are often created by an umbrella agreement, which is also referred to as a 'blanket purchase order.' This umbrella agreement sets forth the terms governing items such as price, length of the contract, warranty details, indemnification, and termination. Most importantly, in a requirements contract, the terms of the blanket purchase order also dictate that the buyer will obtain a set share of its total need from the seller (such as 'all requirements of the buyer'). This phrase satisfies the quantity term required by the statute of frauds. To supplement this general term, the buyer will typically later issue 'releases' to let the seller know its specific short-term requirements.

*Id.* at *4 (internal citations omitted).

---

[2] But, it added, "when a contract provides a quantity term but fails to express details sufficient to determine the specific or total quantity, 'it may be explained or supplemented by parol evidence.'" *Id.* (quoting *In re Frost*, 130 Mich. App. at 560).

The Court contrasted output and requirements contracts with "release-by-release contracts." These latter contracts, the Court detailed,

> are governed by a blanket purchase order that sets the overall contract terms, and the buyer issues subsequent releases that set forth the specific quantity the buyer needs. But unlike a requirements contract, the blanket purchase order does not set forth the share of the buyer's need to be purchased from the supplier. Instead, the purchase order is more appropriately thought of as an umbrella agreement that governs the terms of future contract offers. Although the seller is not bound to accept future orders in the same manner as with a requirements contract, the seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted.

*Id.* at *4 (internal citations omitted). Put simply, the umbrella agreements in release-by-release contracts do not contain sufficient quantity terms; instead, the quantity terms are supplied in the individual releases. *Id.* The Court stressed:

> The key difference between a requirements contract and a release-by-release contract rests in the level of mutual obligation between the parties and the risk each party bears. A requirements contract assures the seller that the buyer will be a customer for the length of the contract, but the seller cannot reject future orders for the length of the contract. In contrast, a release-by-release contract gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release. The seller cannot be guaranteed future business from the buyer, but the seller can accept or reject any offer for future orders.

*Id.* at *5 (internal citations and quotation marks omitted).

Turning to the facts of and arguments in the specific case before it, the Supreme Court held that the term "blanket order" does not encompass a quantity term nor create a requirements contract and that "an implied duty of good faith and fair

dealing" does not do so either. *Id.* *8–10. It concluded that the parties [had] entered into a release-by-release contract." *Id.* at *10.

## C. Higuchi files this case, and both parties move for expedited relief.

On August 2, 2023, a few weeks after *Airboss* came out, Higuchi filed this lawsuit against Autoliv. (ECF No. 1.) Two days later, Higuchi filed an amended complaint alleging that "the blanket purchase order does not constitute an enforceable contract for the sale of goods because it lacks a quantity term." (ECF No. 3, PageID 45.) Higuchi asked for only one form of relief: "a declaratory judgment . . . finding that the 'blanket' purchase order between the parties is not enforceable under Michigan law, and that the only enforceable contracts between Higuchi and Autoliv are the individual purchase contracts formed when Higuchi accepts one of Autoliv's releases." (ECF No. 3, PageID 46.)

On August 10th, Higuchi filed an Expedited Motion for Declaratory Judgment that expanded on its argument that the purchase orders are not enforceable because they lack a quantity term and the parties have a release-by-release contract. (ECF No. 11.)[3]

---

[3] In this Motion, Higuchi also asked for "speedy hearing of [its] declaratory judgment action" under Federal Rule of Civil Procedure 57. (ECF No. 11, PageID 188.) On that point, Higuchi argued that a speedy hearing was warranted because "the parties have agreed, under protest, to a two-week continuation of the supply of parts by Higuchi to Autoliv that currently expires on August 20, 2023," because "Higuchi seeks declaratory relief based on the plain language of the purchase order, [so] there are no relevant factual disputes between the parties," because "Higuchi's

The next day, August 11th, Autoliv filed a counterclaim "seek[ing] a court declaration confirming the parties' have enforceable requirements contracts"—by way of "(i) the Purchase Orders (issued under protest), (ii) Autoliv's terms and conditions, and (iii) [an] April 2022 settlement agreement"—"for the Parts [at issue]," and also seeking "issuance of preliminary and permanent injunctive relief to compel Higuchi to supply Parts, without interruption, until resolution of this lawsuit on the merits." (ECF No. 13, PageID 269–70.)

That same day, Autoliv filed an Emergency Motion for a Preliminary Injunction "compelling Higuchi to continue delivering Autoliv's requirements for over 170 unique automotive parts." (ECF No. 14, PageID 305.)

On August 14th, this Court set a hearing on the parties' motions for August 16th.

On August 15th, Autoliv responded to Higuchi's motion. (ECF No. 17.) And on August 16th, Higuchi responded to Autoliv's motion (ECF No. 18) and replied to Autoliv's response to its own Motion (ECF No. 21).

---

request for declaratory judgment will terminate this controversy in its entirety," and because "Autoliv concurs in the request for expedited consideration." (ECF No. 11, PageID 186–90) (citing, among other cases, *GBX Assocs., LLC v. United States*, No. 22-cv-401, 2022 WL 1016218 (N.D. Ohio Apr. 5, 2022); *Miller v. Warner Literary Grp., LLC*, No. 12-cv-12871, 2013 WL 360012 (D. Colo. Jan. 30, 2013); and *Tri-State Generation & Transmission Ass'n Inc. v. BNSF Ry. Co.*, No. 08-cv-272, 2008 WL 2465407 (D. Ariz. June 17, 2008)). The Court held a speedy hearing as requested.

The Court held the hearing on August 16th as scheduled. Both parties presented excellent arguments.

## II. DISCUSSION

For the reasons that follow, the Court will find that the purchase orders are requirements contracts that contain enforceable quantity terms that commit Higuchi to selling to Autoliv, and commit Autoliv to buying from Higuchi, all of Autoliv's requirements for the parts listed in the Orders, for the time period also listed therein. In turn, the Court will **DENY** Higuchi's Expedited Motion for Declaratory Judgment (ECF No. 11) and **DISMISS WITH PREJUDICE** Higuchi's Amended Complaint (ECF No. 3).

Finally, the Court will **GRANT** Autoliv's Emergency Motion for a Preliminary Injunction. (ECF No. 14.)

**A. The purchase orders are requirements contracts.**

The Court's "goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Wyandotte Elec. Supply Co. v. Elec. Tech. Sys., Inc.*, 499 Mich. 127, 143–44 (2016).[4]

---

[4] Both parties assented to the Court following Michigan law to evaluate the issues now before it. (ECF No. 14, PageID 312 n.2; ECF No. 21, PageID 470.)

The Court finds that the plain language of the purchase orders' "Statement of Work" paragraph indicates that these orders are requirements contracts that contain sufficient quantity terms. The Court further finds that, contrary to Higuchi's arguments, neither Note I of the purchase orders, nor Article 25 of the orders' Terms and Conditions, nor the case law cited by Higuchi, undermines this conclusion.

*1. The purchase orders' Statement of Work paragraph indicates that the orders are requirements contracts.*

The Statement of Work paragraph is the first full paragraph in the purchase orders. As noted above, it provides:

> This blanket contract is issued to cover Autoliv ASP, Inc.'s requirements of the parts listed below, for the period beginning 05/01/22 [or a different date, depending on the purchase order] and ending upon the termination of the vehicle platform, including service part requirements, for which the parts listed herein are used. Deliveries shall be made only in the quantities and at the time specified in such requirements. Autoliv ASP, Inc. shall reserve the right to change, from time-to-time, the quantities specified in any part requirement. In such event Autoliv ASP, Inc. shall be under no obligation to [Higuchi] unless the delivery or fabrication of such parts or the acquisition of such raw materials was specifically authorized in a Release delivered to [Higuchi] from Autoliv ASP, Inc[.]

(ECF No. 3, PageID 48.)

This paragraph reveals that the purchase orders are requirements contracts. The first sentence states that the contract "*cover*[*s*] Autoliv['*s*] *requirements* of the parts listed below," and the second sentence adds that "[d]eliveries *shall* be made only in the quantities and at the time specified *in such requirements*." Together, these

10

sentences make clear that the orders intend for Higuchi to provide Autoliv with its *requirements* of the parts listed in the order (during the specified timeframe).[5]

From there, Section 440.2306(1) of the UCC, which *Airboss* relied on in its discussion of requirements contracts and quantity terms, establishes that "requirements" in this context "means [Autoliv's] actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate . . . to any normal or otherwise comparable prior . . . requirements may be . . . demanded." Further, the Comments to Section 440.2306(1) guarantee that such a "contract for . . . *requirements* is not too indefinite," given that "requirements" holds that specific definition.

The third and fourth sentences of the Statement of Work paragraph comport with this understanding. In the third sentence, Autoliv "reserve[s] the right to change . . . the quantities specified in any part *requirement*." This merely allows Autoliv to inform Higuchi of the inevitable changes to its *actual* requirements. Such an allowance is in line with Section 440.2306(1), the Comments of which note: "Reasonable elasticity in the requirements is expressly envisaged by this section and

---

[5] Autoliv argues that the purchase orders' use of the word "cover" in the first sentence shows that the purchase orders merely "'deal with' the subject of Autoliv's requirements of the parts" and do not suggest that Autoliv will "purchase" those requirements. (ECF No. 18, PageID 421.) The Court *might* have found this argument more persuasive if the next sentence did not clarify that Higuchi *shall* deliver the quantities that satisfy those requirements.

good faith variations from prior requirements are permitted . . . ." The allowance here does *not* grant Autoliv the freedom to change its order for parts covered by the contract on a whim nor for any other reason besides a change in its actual requirements for those parts.

Lastly, the fourth sentence provides that, in the event of Autoliv changing the quantity of a part *requirement*, Autoliv "shall be under no obligation to [Higuchi] unless the delivery or fabrication of such parts or the acquisition of such raw materials was specifically authorized in a Release delivered to [Higuchi] from Autoliv." Higuchi argues that this sentence means that "Autoliv's commitment to buy and Higuchi's commitment to sell are based entirely on the releases." (ECF No. 18, PageID 422–23.) But the Court disagrees. Nowhere does the sentence suggest that Autoliv retains discretion to fill in the Releases however it wants, nor that Autoliv can otherwise change its orders for parts based on anything other than a change in its actual, good faith *requirements*, as described above. Instead, the sentence says only that *if* Autoliv changes the quantities specified in one of its part *requirements*, then Higuchi must deliver, fabricate, and acquire the materials for the part in question as authorized in a Release. Given that the three preceding sentences reiterate multiple times that Autoliv and Higuchi are contracting for the latter to supply the former's part *requirements*, that those three sentences do not explain how Autoliv will communicate changes to those *requirements*, and that this sentence

immediately qualifies itself as applying to situations where Autoliv changes the *requirements*, the natural reading of the newly-introduced, undefined "Release" term is that it will reflect—and be dictated by—updated *requirements*. *See* ECF No. 14, PageID 316–18. In other words, the paragraph reveals that the contents of the releases will depend upon Autoliv's requirements, not that Autoliv's "requirements" will depend upon the contents of the releases.

Finally, Higuchi argues that the purchase orders lack a sufficient quantity term because they fail to commit Autoliv to buying "a *set share* of its total need from" Higuchi. (ECF No. 18, PageID 420) (emphasis added). But this argument is unavailing. Although "the word 'all' is [] absent" from the Statement of Work paragraph (ECF No. 18, PageID 420), the plain meaning of "requirements" as used in that paragraph is "all requirements." The UCC, common usage, and case law all support this interpretation. Indeed, the word "all" is also absent from the UCC's Section 440.2306(1), which states, again, that "requirements" "means such actual . . . requirements as may occur in good faith" and "is not too indefinite" to supply a quantity term. Common sense teaches that, when someone refers to their "requirements" or "actual requirements" without any further qualification, that person is referring to *all* of their requirements. And this Court has applied that principle in the context of automotive supplier contracts in the past. *See Dayco Prods., LLC v. Thistle Molded Grp., LLC*, No. 18-10862, 2019 WL 423523, at *5

(E.D. Mich. Feb. 4, 2019) ("Dayco's terms stated that 'the quantity is for [Dayco's] requirements.' As explained above, this term means that Dayco committed ot purchase all of its actual, good-faith requirements from Moxness.").

It is true that *Airboss* used "*all* requirements of the buyer" as an example of a clear, model quantity term. *Airboss Flexible Prods. Co.*, 2023 WL 4476721, at *4 (emphasis added). Even so, *Airboss* did *not* state that the word "all" cannot be implied from an unqualified use of the word "requirements." Nor did it state that the word "all"—or any other share-related modifier—is necessary to render "requirements" an enforceable quantity term.

*2. Note I does not undermine the conclusion that the purchase orders are requirements contracts.*

As noted above, Note I provides:

> This Purchase Order/Contract does not constitute Autoliv's promise to order or buy any volume of or level of service, unless separately confirmed in writing by Autoliv or electronically in accordance with established means. Nor does this purchase order/contract represent Autoliv's promise to purchase items or services beyond mutually agreed time periods[.]

(ECF No. 3, PageID 51.)

Higuchi argues that the first sentence of this note contains a typo and it should either read "any volume or level of service" or "any volume of items or level of service" and (either way) thereby disclaim that the purchase order includes any quantity commitment. (ECF No. 18, PageID 424–25.) Higuchi supports this

argument by asserting that "service is not measured in volumes, only in levels, as is demonstrated in . . . Article 4(c) of the terms and conditions," which "states that sellers must provides 'the specified quantity, volume, level of services, etc,'" and by pointing out that the second sentence of Note I references "items or services." (ECF No. 18, PageID 424) (citing ECF No. 14-3).

Autoliv responds that there is no reason to infer that the note contains a typo and that even if its first sentence did refer to "any volume of *goods*" it would only mean that "Autoliv does not commit that it will require any specific volume or 'minimum buy' of the parts." (ECF No. 14, PageID 317–18.)

The Court agrees with Autoliv. It is not clear to the Court that service is "only" measured in "levels" and never in "volumes." The relationship between the first and second sentences is not such that the use of the word "items" in the second necessitates its inclusion in the first. In fact, the word's inclusion in the second sentence could indicate that the parties had the word at the top of their minds and consciously chose to omit it from the first. And even if the first sentence did disclaim any promise to order "any *volume* of goods," that disclaimer would merely reflect that the purchase order constitutes a promise for Autoliv to buy its part *requirements*, whatever those requirements may be, and not a promise for Autoliv to buy any fixed, *numerical* volume of parts.

(The parties have not argued about the second sentence on its own, but the Court will briefly note that the second sentence simply emphasizes that Autoliv is only committing to purchase its requirements for the time period identified in the Statement of Work paragraph and is not committing to make any purchases outside of that period.)

*3. Article 25 does not undermine the conclusion that the purchase orders are requirements contracts.*

Article 25(b) of the Purchase Order Terms and Conditions provides, in relevant part: "In addition to any other rights of Autoliv ASP to cancel or terminate this Contract, Autoliv ASP may at its option immediately terminate all or any part of this Contract or releases hereunder, at any time and for any reason, by giving written notice to the Seller." (ECF No. 11-3, PageID 234.) Higuchi argues that "[t]his means that the contract, including the purchase orders, does not provide Higuchi any commitment from Autoliv beyond the current release." (ECF No. 18, PageID 423.)

The Court disagrees. This provision has no bearing on whether Autoliv is making a contractual commitment by way of the purchase orders or only by way of the releases. Rather, the provision is stating that Autoliv can terminate at its convenience *whatever* commitments it may have made. So the provision relates to the length of the existence of the contract but not to the question of whether the contract constitutes an enforceable requirements contract during that existence. *Cf. Airboss Flexible Prods. Co.*, 2023 WL 4476721, at *5 ("A requirements contract assures the

16

seller that the buyer will be a customer *for the length of the contract*, but the seller cannot reject future orders *for the length of the contract*." (emphasis added)); *Eberspaecher N. Am., Inc. v. Nelson Glob. Prods., Inc.*, No. 12-11045, 2012 WL 4356781, at *7 n.5 (E.D. Mich. Sept. 23, 2012) (". . . Defendant simply offers no support for its contention that a termination-for-convenience clause evinces a lack of consideration, provided that the parties had an otherwise enforceable requirements contract.").

Next, Article 25(c) of the Terms and Conditions provides, in relevant part:

> Notwithstanding the foregoing, Autoliv ASP shall not be obligated to make payments for finished goods, work-in-progress or raw materials fabricated or purchased by Seller in excess of amounts *authorized by this Contract and delivery releases* issued by Autoliv ASP hereunder, nor shall Autoliv ASP be obligated to make payments for undelivered goods or materials that are in Seller's standard inventory or that are readily marketable.

(ECF No. 11-3, PageID 235) (emphasis added). Autoliv argues that the italicized portion of this provision "makes the releases essential to establishing the quantity Autoliv is bound to purchase" and demonstrates that "the purchase order cannot stand alone" and cannot be separated from the releases. (ECF No. 18, PageID 424.) Autoliv notes that the provision makes "no mention of or reference to Autoliv's 'requirements.'" (ECF No. 18, PageID 424.)

Nonetheless, the Court finds that this language is consistent with the requirements contract that it described above. In the Court's understanding, the purchase orders

indicate that Autoliv will buy its part requirements from Higuchi and then the releases indicate the exact numerical values that represent those requirements at a given time. Accordingly, both documents work together to authorize the exact amount of goods that Higuchi will make for Autoliv. Without the purchase orders, the releases would be unbounded and indeterminate; without the releases, the purchase orders would not impart up-to-date, numerically precise instructions. Article 25(c) accounts for this symbiotic relationship.

*4. The case law cited by Higuchi does not undermine the conclusion that the purchase orders are requirements contracts.*

Finally, Higuchi argues that the results of both *Airboss* and *Advanced Plastics Corporation v. White Consolidated Industries, Incorporated*, a Sixth Circuit case, compel this Court to find that the purchase orders here are release-by-release contracts. (ECF No. 11, PageID 197–99.) Neither case's result does so.

First, the contract in *Airboss* did not contain any reference to "requirements" like that in the purchase orders at issue here. And unlike the plaintiff in *Airboss*, Autoliv does not rely on the phrase "blanket contract," nor the duty of good faith, nor any other vague "award" to establish a requirements contract. Therefore, the outcome of that case does not control the outcome of this one.

Second, though the contract in *Advanced Plastics* did contain a reference to requirements, that reference was accompanied by a dispositive qualification. Specifically, the contract stated that "Seller agrees to furnish Buyer's requirements

18

for the goods or services covered by this Purchase Order *to the extent of and in accordance with* . . . Buyer's written instructions," which instructions (it was undisputed) were "releases issued by" the Buyer. *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 47 F.3d 1167, at *2 (6th Cir. 1995) (Table) (emphasis and ellipses *Advanced Plastics*'). The contract also stated that the "Buyer shall have no obligation to honor invoices for goods or services fabricated, rendered, or delivered other than according to the . . . written instructions of Buyer pursuant to" the previous quote. *Id.* (ellipses *Advanced Plastics*'). The Sixth Circuit held that this language "clearly demonstrate[d] that the parties intended for [the Buyer] to purchase quantities of parts only according to its releases, and not according to its requirements." *Id.* But that holding does not control this case, because the purchase orders here repeatedly used the word "requirements" without any "to the extent that" qualification and Note I only disclaimed Autoliv's obligations as to services (or alternatively, as to specific *volumes* of goods rather than as to *any* commitment concerning goods).

**B. The Court DENIES Higuchi's Expedited Motion for Declaratory Judgment and DISMISSES WITH PREJUDICE Higuchi's Amended Complaint.**

Because Higuchi's request for declaratory relief and Amended Complaint hinge on its assertion that the purchase orders are not requirements contracts, Higuchi's Expedited Motion for Declaratory Judgment (ECF No. 11) is **DENIED** and its Amended Complaint (ECF No. 3) is **DISMISSED WITH PREJUDICE**.

## C. The Court GRANTS Autoliv's Emergency Motion for a Preliminary Injunction.

Lastly, the Court turns to Autoliv's Emergency Motion for a Preliminary Injunction. Autoliv "seeks a preliminary injunction under Fed. R. Civ. P. 65(a) compelling Higuchi to continue to comply with its contractual obligations to deliver all the parts Autoliv requires for the life of each applicable vehicle program." (ECF No. 14, PageID 311.)

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court finds that Autoliv has established all of these things.

*1. Autoliv is likely to succeed on the merits.*

Autoliv argues that it "is likely to prove that Higuchi [will] breach[] its contractual obligation to deliver all the parts Autoliv requires for the life of each applicable vehicle program . . . [i]f Higuchi follows through on its threat to stop deliveries." (ECF No. 14, PageID 312–13.)

Higuchi responds that Autoliv is not likely to succeed on the merits because the purchase orders "are not requirements contracts" and Higuchi and Autoliv "operate under a release-by-release contract." (ECF No. 18, PageID 415–30.)

As stated above, the Court has found that the purchase orders are requirements contracts. Therefore, the Court finds that if Higuchi fails to provide Autoliv with Autoliv's actual, good-faith requirements of the parts listed in the purchase orders during the timeframe listed therein then Higuchi will breach the purchase order contracts. Thus, Autoliv is likely to succeed on the merits.

*2. Autoliv is likely to suffer irreparable harm in the absence of preliminary relief.*

Autoliv notes that "'[a] showing of probable irreparable harm is the single most important perquisite to granting injunctive relief.'" (ECF No. 14, PageID 319) (citing *Cooper-Standard Auto. Inc. v. Daikin Am., Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021)). It states "[p]robable irreparable harm is established when it cannot adequately be compensated by money damages." (ECF No. 14, PageID 319) (citing *Cooper-Standard*, 568 F. Supp. 3d at 848 and *Merrill Lynch v. E.F. Hutton & Co., Inc.*, 403 F. Supp. 336, 343 (E.D. Mich. 1975)). And it asserts that, "[i]n the automotive industry, harm cannot be adequately compensated where the 'just-in-time nature' of the supply chain creates 'potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under the contract.'" (ECF No. 14, PageID 319) (quoting *Cooper-Standard*, 568 F. Supp. 3d at 848).

As to the specifics of this case, Autoliv argues that "[i]f Higuchi stops delivering parts to Autoliv, Autoliv won't be able to fulfill its obligations to its [original

21

equipment manufacturer ("OEM")] customers," that '[t]his will destroy Autoliv's reputation in the industry and its goodwill with these customers," that "[t]he OEMs will be forced to idle their operations because they can't build cars without seatbelts," and that this will "spread[] [] shutdowns throughout the supply chain and idl[e] potentially thousands of workers." (ECF No. 14, PageID 319.) Autoliv further avers that, "because of the safety-critical nature of the many parts Higuchi delivers, these damages will likely last for potentially years; it could take Autoliv years to find and validate new suppliers for each of these parts." (ECF No. 14, PageID 320) (citing *Zurn Constructors, Inc. v. BF Goodrich Co.*, 685 F. Supp. 1172 (D. Kan. 1998) for the proposition that "[l]oss of customers, loss of goodwill, and threats to a business's viability are sufficient evidence of irreparable harm").

Autoliv also asserts that it should not be forced to "avoid this harm by paying the higher prices Higuchi demands," because "the duty to cover doesn't apply to the parts that Autoliv already contracted for," and "Michigan courts have long recognized that "'a breach of contract in the automotive industry may be more coercive than in other industries.'" (ECF No. 14, PageID 320–22) (quoting *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 798 n.7 (E.D. Mich. 1990) and also citing, among other cases, *Cooper-Standard*, 568 F. Supp. 3d at 848 and *Eberspaecher N. Am., Inc. v. Nelson Glob. Prods., Inc.*, No. 12-11045, 2012 WL 1247174, at *5–6 (E.D. Mich. Apr. 13, 2012)).

Autoliv sums up: "Each of (1) the destruction of Autoliv's goodwill and reputation, (2) the damage to the supply chain as a whole, and (3) Higuchi's demand that Autoliv waive its legal rights tips this factor in favor of entering an injunction. Taken together, this factor heavily favors granting Autoliv's motion." (ECF No. 14, PageID 323.)

Higuchi argues that "[a] party that _could_ pay increased prices, and sue for breach of contract afterwards is not harmed 'irreparably.'" (ECF No. 18, PageID 431) (citing *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008)). It asserts that "Autoliv's [] injury can be compensated by money damages, in the form of paying any increased prices under protest and later suing for breach of contract." (ECF No. 18, PageID 431.) And it notes that "Autoliv has, by its own admission, repeatedly paid under protest and then later sued to recover." (ECF No. 18, PageID 431.) At the hearing, Higuchi stated that, "in a showing of good faith, if the Court were to rule that [the purchase orders are] release-by-release contract[s], [Higuchi] would be willing to continue to produce its parts and not cut [Autoliv] off under the pricing terms that [the parties] have [used] for six months or so," but it also clarified that it would *not* be "obligated to" do so. (ECF No. 22, PageID 492.)

The Court finds that Autoliv has shown that it is likely to suffer irreparable harm in the absence of preliminary relief. Autoliv has presented sworn evidence that "[t]he

Parts [at issue] are unique, custom made, and not available on the open market."
(ECF No. 14-2, PageID 330.) Autoliv has also presented evidence that, in light of
that reality, if Higuchi refuses to abide by the purchase orders and the parties'
relationship breaks down—and Higuchi's "good faith" assurances provide no
guarantee that this would not happen, especially considering the parties' recent
history—then Autoliv's business will suffer substantial and irreparable harm
through loss of goodwill and long-lasting interruptions to the automotive supply
chain. *See* ECF No. 14-2; *Eberspaecher N. Am., Inc.*, 2012 WL 1247174, at *6
("[T]he potentially catastrophic effects of a disruption in the supply chain of
automotive parts is well established in the case law of this court.").

Moreover, the Court agrees with Autoliv that Autoliv should not be forced to
comply with Higuchi's demands that it pay prices higher than those agreed to in the
purchase orders to avoid this harm. *Cf. Cooper-Standard*, 568 F. Supp. 3d at 848;
*BAE Indus., Inc. v. Agrati – Medina, LLC*, No. 22-12134, 2022 WL 4372923, at *6
(E.D. Mich. Sept. 21, 2022).

*3. The balance of equities tips in Autoliv's favor.*

Autoliv argues that "the damage [it] will suffer without an injunction
significantly outweighs any harm an injunction will cause Higuchi." (ECF No. 14,
PageID 323) (later citing *Zurn Constructors, Inc.*, 685 F. Supp. at 1182 for this same
proposition). It asserts again that "Autoliv and the OEMs will suffer significant harm

if Higuchi is not compelled to perform its obligations under the contracts," and contrasts that possibility with the alternative, in which the Court grants the preliminary injunction and "Higuchi will merely have to do what it already agreed to do—deliver the parts in exchange for the prices it agreed to." (ECF No. 14, PageID 323.) Autoliv assures the Court that, "[e]ven if Higuchi were to prevail on the merits, any arguable harm that [Higuchi] sustains from specific performance is easily remedied by money." (ECF No. 14, PageID 323.)

Higuchi responds that, "[b]ecause the requested injunction will alter the status quo, rather than preserve it, this factor weighs against Autoliv's requested relief." (ECF No. 18, PageID 432–33) (citing *Diversified Mortg. Investors v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976) for the proposition that a preliminary injunction "should not be used as a device for creating a new contract between the parties"). Higuchi argues that the injunction will place it in "financial peril" by forcing it "to accept releases, at tremendous and catastrophic losses, and in the absence of any obligation to do so." (ECF No. 18, PageID 432); *see also* ECF No. 20 ("Higuchi can no longer afford to continue with this pricing arrangement, and continued losses, such as those described above, will inevitably force Higuchi out of this business.").

The Court finds that the balance of the equities tips in Autoliv's favor. As explained above, if the Court does not enter the preliminary injunction, then Higuchi

is likely to breach the parties' contract and Autoliv is likely to suffer irreparable harm as a result of that breach. On the other hand, if the Court does enter the injunction, Higuchi will be forced to accept the releases that it agreed to accept through the purchase orders.[6] Although Higuchi has offered evidence that forcing it to accept the releases would place a financial burden on it, it has not shown that forcing it to do so would be inequitable. Plus, Autoliv has its own incentives to ensure that it does not drive Higuchi out of business: it needs Higuchi to supply it with unique seatbelt parts. The potential harm to Autoliv outweighs the potential harm to Higuchi. *Cf. Eberspaecher N. Am., Inc.*, 2012 WL 1247174, at *6 ("The only concrete, countervailing harm Defendant advances is the monetary losses it will continue to absorb if forced to keep supplying Plaintiff at the prices reflected in the Purchase Orders, when it would otherwise be free to allocate its resources to procuring more profitable business. This pales in comparison to the potential production shut downs and work stoppages that may result if Defendant stops shipping to plaintiff." (internal citation omitted)).

*4. An injunction is in the public interest.*

Lastly, Autoliv contends that "[t]he public interest favors keeping Autoliv, its customers, the OEMs, and the other suppliers' facilities operating, and their workers

---

[6] Of course, if the releases do not reflect Autoliv's actual, good-faith requirements, then Higuchi is not obligated to accept them. But that is a separate issue that has not been raised here.

employed," and also favors "'preserving the enforceability of contracts.'" (ECF No.

14, PageID 324) (citing *JD Norman Indus., Inc. v. Metaldyne, LLC*, No. 15-13863,

2016 WL 1637561, at *9 (E.D. Mich. Apr. 26, 2016) and then quoting *Neveux v.

Webcraft Tech., Inc.*, 921 F. Supp. 1568, 1573 (E.D. Mich. 1996)).

In response, Autoliv agrees that "the public interest lies in preserving the

enforceability of contracts . . . as written." (ECF No. 18, PageID 433) (citing

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535,

551 (6th Cir. 2007) and *Spartech CMD, LLC v. Int'l Auto. Components Grp. N. Am.,

Inc.*, No. 08-13234, 2009 WL 440905 (E.D. Mich. Feb. 23, 2009)). But it maintains

that the requested injunction would "rewrite" the contracts at issue here. (ECF No.

18, PageID 433.)

The Court finds that granting Autoliv's request for a preliminary injunction is in

the public interest because the injunction will enforce the purchase orders as written

and because the injunction will prevent a shut down of the automotive supply chain.

*

Accordingly, because Autoliv has established all four requirements for a

preliminary injunction, Autoliv's Emergency Motion for a Preliminary Injunction

(ECF No. 14) is **GRANTED**.

27

### III. CONCLUSION

For the reasons listed above, the Court:

(1) **DENIES** Higuchi's Expedited Motion for Declaratory Judgment (ECF No. 11).

(2) **DISMISSES WITH PREJUDICE** Higuchi's Amended Complaint (ECF No. 3); and

(3) **GRANTS** Autoliv's Emergency Motion for a Preliminary Injunction (ECF No. 14). Pursuant to this grant, the Court **ORDERS** Higuchi "to supply Parts under the Purchase Orders, without interruption," "at the prices the parties agreed to under protest . . . before August, 2, 2023," "until final resolution of this lawsuit on the merits." (ECF No. 13, PageID 271; ECF No. 14, PageID 305, 324.)

For now, the Court will not order Autoliv to produce a security bond under Federal Rule of Civil Procedure 56(c), because Higuchi "has the burden of establishing the need for [such] a bond and the required amount," and it has not yet met that burden. *RGIS, LLC v. Gerdes*, No. 19-11866, 2020 WL 409657, at *1 (E.D. Mich. Jan. 24, 2020) (citing *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 432 (6th Cir. 2013)); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("[T]he rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

The Court recognizes that Higuchi stated at the hearing that if the Court were to issue a preliminary injunction against it *then* it would likely move for a security bond. *See* ECF No. 22, PageID 500–01. Higuchi is free to do so.

**IT IS SO ORDERED.**

Dated: August 18, 2023

s/Paul D. Borman
Paul D. Borman
United States District Judge